UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X
                                           :

GINA G. RIGGI,                    :      Civil Action No.:
                                             :

          Plaintiff,          :      **COMPLAINT**
                                             :

     -against-           :      <u>**Jury Trial Demanded**</u>
                                           :

CHARLIE ROSE INC., CHARLES   :
PEETE ROSE JR. a/k/a CHARLIE   :
ROSE, and BLOOMBERG, L.P.,      :
                                             :

          Defendants.        :
--------------------------------------------------X

       Plaintiff Gina G. Riggi, by and through her attorneys, Stulberg & Walsh, LLP, brings

this Complaint against her former employers, Charlie Rose Inc. ("CRI") and Charles Peete

Rose ("Charlie Rose" or "Mr. Rose") (collectively "Rose"), and Bloomberg, L.P.

("Bloomberg") (collectively "Defendants").  Ms. Riggi respectfully alleges, with knowledge

as to herself and upon information and belief otherwise, as follows:

<u>**PRELIMINARY STATEMENT**</u>

      1.     Plaintiff Gina G. Riggi is a 67-year-old makeup artist, formerly employed by

Defendants as Head/Key Makeup Artist for the Charlie Rose Show ("the Show"), and a

related program, "Charlie Rose: The Week" ("the Week").

      2.     Ms. Riggi first started working on the Show in 1995.

      3.     Ms. Riggi managed the Show's makeup department, contributing greatly to

the Show's success, until the Public Broadcasting Service ("PBS") cancelled it in November

2017 in response to widely publicized allegations that Mr. Rose had abused and sexually

harassed his female staff, and other women, for decades.

4.      As detailed in the allegations below, throughout her tenure on the Show, Defendants subjected Ms. Riggi to a hostile work environment based on sex, through a pattern of misogynistic, abusive, demeaning, embarrassing and degrading behavior directed both at Ms. Riggi and other female staff.

5.      Mr. Rose created a toxic work environment suffused with sexual harassment and gender-based abuse, using the Show to facilitate his predatory sexual behavior, and the Bloomberg studio where he recorded it as his sexual hunting ground.

6.      Bloomberg and CRI knew of this behavior and failed to take any steps to prevent or remediate it.

7.      Mr. Rose preyed upon his female staff at Bloomberg's studio, at his Sherry-Netherland apartment, at his Hamptons home in Bellport, New York, and at the trendy restaurants where he hosted staff events.

8.      On information and belief, Mr. Rose also engaged in this sexually harassing and abusive conduct toward female staff and other women during work-related travel, at hotels, on airplanes, in limousines, at the CBS broadcasting studio, at Mr. Rose's own offices, and elsewhere.

9.      Throughout the workday, and at work events, Mr. Rose routinely groped and pawed at his female staff, pressed himself against them, hugged them, kissed them, pulled them toward him, whispered in their ears, stared at their breasts, looked down their shirts, and otherwise subjected them to inappropriate and unwanted physical contact.  Mr. Rose commented on their physical appearance, asked inappropriate questions about their personal and romantic lives, and barraged them with late-night phone calls. In many instances, as

2

detailed below, he made explicit sexual overtures.

10.     Mr. Rose targeted young, attractive women just beginning their journalism careers, dangling internships and jobs to lure them to "interviews" and "career discussions" with him, often over drinks and dinner.  But, far from being an advocate for their careers, Mr. Rose treated them as sexual targets, using his power and influence to serve his personal desires. In many instances, he never offered these women any employment at all.  When he did hire young women to work on the Show, they often endured unpleasant assignments working off-site at Mr. Rose's homes, making deliveries to Mr. Rose at his residences, and serving as Mr. Rose's "travel companions," subject to Mr. Rose's inappropriate advances.  On a regular basis, Mr. Rose also harassed personal assistants, executive assistants, producers and other women who worked on the Show.

11.     When female staff reacted negatively to Mr. Rose's overtures, failed to appeal to him physically, or disappointed him in some other way, he abused them, showered them with criticism, questioned their intelligence, humiliated them, and otherwise demeaned and degraded them.  At times, Mr. Rose became threatening and physically menacing toward women who worked on the Show, looming over them in an aggressive fashion, backing them against walls, and in Ms. Riggi's case, physically swatting at her.

12.     On information and belief, Mr. Rose did not treat men in the same abusive and degrading fashion that he treated women.

13.     Mr. Rose's severe and pervasive sexual harassment and menacing of other

3

women and misogyny towards Plaintiff, made manifest in physical and verbal abuse, created an environment that Plaintiff experienced as abusive because of gender.

14.    Ms. Riggi personally was subjected to and observed Mr. Rose's inappropriate conduct and harassment of female staff on countless occasions. Ms. Riggi was a victim of Mr. Rose's misogynistic abuse herself and served as a resource for other female staff targeted by Mr. Rose, many of whom used her makeup room and the adjoining Green Room, where guests waited, as a refuge from Mr. Rose. Ms. Riggi felt a maternal, protective instinct toward her younger female colleagues, who often came to her in tears, distraught and visibly shaken, sharing their stories of Mr. Rose's unwelcome sexual overtures, misogyny and abuse.

15.    Mr. Rose's misogyny towards Ms. Riggi, and constant sexual harassment of other women in her presence, created a sex-based severe hostile work environment for Ms. Riggi.

16.    On information and belief, the supervisors who worked on the Show, including the Show's Executive Producer, Yvette Vega, were Bloomberg employees, and jointly employed by Mr. Rose and CRI. Bloomberg supervisors personally observed Mr. Rose's behavior on a regular basis, and received numerous complaints from female staff about Mr. Rose over the years. In some instances, Bloomberg supervisors were themselves the victims of Mr. Rose's harassment. Despite substantial notice of Mr. Rose's behavior for many years, Bloomberg refused to address or remediate it. Ms. Vega characterized the conduct as "Just Charlie being Charlie."

4

17. On or about late November 2017, when the Show was cancelled, Defendants terminated Ms. Riggi's employment, not due to any fault of her own, but because of Mr. Rose's own unlawful and deplorable behavior.

18. Defendants' unlawful conduct has caused Ms. Riggi substantial emotional and financial harm.

19. Ms. Riggi seeks damages and equitable relief for the unlawful discrimination she has endured, as detailed below, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*.; and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 296, *et seq*.

## PARTIES

20. Plaintiff Ms. Riggi, a 67-year-old female, is a resident, citizen and domiciliary of New Jersey. At all times relevant, she worked for Defendants as a makeup artist.

21. Defendant Bloomberg is a foreign limited partnership, doing business in New York, New York and having a principal place of business and/or address in New York, New York.

22. Upon information and belief, at all relevant times, Bloomberg employed 15 or more persons, regularly realized more than $500,000 in annual earnings, and operated an enterprise engaged in commerce within the meaning of Title VII of the 1964 Civil Rights Act.

23. Along with CRI and Mr. Rose, Bloomberg and Bloomberg supervisors managed, directed and exercised complete supervisory control over Ms. Riggi's work.

24. Defendant CRI is a foreign business corporation, doing business in New York,

New York and having a principal place of business and/or address in New York, New York. On information and belief, CRI is wholly controlled by Mr. Rose.

25. Upon information and belief, at all relevant times CRI employed 15 or more persons, regularly realizing more than $500,000 in annual earnings, and operating an enterprise engaged in commerce within the meaning of Title VII of the 1964 Civil Rights Act.

26. Along with Bloomberg and Mr. Rose, CRI managed, directed and exercised complete supervisory control over Ms. Riggi's work.

27. Upon information and belief, Defendant Charlie Rose, an adult male, is a resident, citizen and domiciliary of New York, New York.

28. Upon information and belief, Mr. Rose holds a controlling ownership interest in CRI and exercises, and at all relevant times has exercised, authority to hire and fire employees on the Show.

29. At all pertinent times, Defendants were employers within the meaning of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h), and within the meaning of the New York State Human Rights Law, N.Y. Exec Law §§ 292(5) and 296.

30. Defendants are jointly and severally liable herein, and are also liable herein as "joint employers."

### JURISDICTION AND VENUE

31. This Court has jurisdiction over Ms. Riggi's Title VII claim under 28 U.S.C. § 1331 (federal question).

32. This Court also has jurisdiction over this action under 28 U.S.C. § 1332 (diversity), as the parties are citizens of different states and the amount in controversy exceeds

$75,000.

33. This Court has jurisdiction over Ms. Riggi's pendent state law claims under 28 U.S.C. § 1367(a) (supplemental jurisdiction), as this claim is so related to Plaintiff's Title VII claim as to form the same case or controversy under Article III of the United States Constitution.

34. Venue is proper within this District, pursuant to 28 U.S.C. § 1391(b), because a Defendant resides in this district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## ADMINISTRATIVE PREREQUISITES

35. Ms. Riggi filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission on September 14, 2017.

36. Ms. Riggi received a "Notice of Right to Sue" from the EEOC on July 25, 2024.

## STATEMENT OF FACTS

37. Ms. Riggi is a makeup artist in the television industry.

38. Ms. Riggi is a member of the National Academy of Television Arts and Sciences ("NATAS"), and has been a Judge for the NATAS Daytime Emmy Awards. She was a two-time elected Governor of the Creative Crafts of NATAS NYC. Ms. Riggi is a member of the International Alliance of Theatrical Stage Employees ("IATSE").

### A. Defendants' Joint Employment of Ms. Riggi

39. In 1995, Defendants hired Ms. Riggi to serve as Head Makeup Artist for the Show.

40. For Ms. Riggi's entire tenure, the Show was taped at Bloomberg headquarters,

7

first at 499 Park Avenue, and since in or around 2004, at 731 Lexington Avenue, New York.

41.    Bloomberg and Rose/CRI jointly employed Ms. Riggi continuously from her

hire until the Show was cancelled, on or about November 21, 2017.

42.    Bloomberg and Rose/CRI exercised complete control over every aspect of Ms.

Riggi's work, directing both the results of the work and the manner and means by

which she performed it. This control included, inter alia:

> (a)    setting a fixed work schedule for Ms. Riggi;
> (b)    changing her work schedule at Mr. Rose's convenience, or in accordance with production demands;
> (c)    assigning the individuals to whom she must provide makeup services;
> (d)    determining the sequence in which she was to perform the work;
> (e)    directing the manner in which she performed the work;
> (f)    instructing her as to which cosmetics, applicators, cleansers, brushes, combs, eye shadow and other materials she should use;
> (g)    providing her with these necessary tools, cosmetics, and other equipment; and
> (h)    reimbursing her for expenses when she purchased supplies herself.

43.    Ms. Riggi could not take vacation time or time off as she wished, and could

not work for other employers during scheduled work hours.

44.    If Ms. Riggi needed to change her schedule or take a day off for illness,

vacation or any other reason, she had to get approval from the Production Manager.

45.    Ms. Riggi was expected to accommodate requests to work in the field, when

Mr. Rose conducted interviews outside of the studio, and she had to accommodate frequent

last minute scheduling changes demanded by Mr. Rose, at risk of losing her job.

46.    Ms. Riggi also performed tasks, at Defendants' request, in addition to her

work as a makeup artist.  Defendants frequently asked Ms. Riggi, *inter alia*, to assist with

wardrobe issues, troubleshoot computers and television monitors, secure car services for guests, and provide beverages for guests. Ms. Riggi was expected to comply with these requests and perform all tasks requested of her by Defendants.

47.    Ms. Riggi did not maintain her own inventory of makeup supplies or purchase supplies at her discretion. Ms. Riggi was instructed to use the makeup supplies, applicators, cleansers, brushes, combs, eye shadow and other material that were available in the Bloomberg supply room. She did not exercise discretion in the selection of these items and purchased additional supplies only when necessary to satisfy the demands of Mr. Rose, for example, purchasing specific brushes or sea sponges that he preferred. Defendants reimbursed Ms. Riggi for these purchases.

48.    Executive Producer Yvette Vega, and Producers Charlotte Morgan, Adam Waller and Courtney Litz routinely instructed Ms. Riggi how to perform her work, for example, telling her to "powder" certain guests; directing her not to apply eye makeup or lipstick in certain cases; telling her not to perform certain grooming tasks which ordinarily she would perform as a makeup artist; or instructing her not to use certain equipment which she ordinarily would have used (such as hair dryers). Sometimes they would direct her to "powder" a guest in the hallway, rather than in her makeup room.

49.    On information and belief, all these producers were Bloomberg employees, on Bloomberg payroll, receiving Bloomberg benefits. In addition to functioning as Bloomberg employees, however, they took direction from Mr. Rose and directed Ms. Riggi's performance in a manner intended to satisfy Mr. Rose's demands.

50.    Defendants also afforded Ms. Riggi many of the same indicia of Bloomberg

employment, providing Ms. Riggi an office on Bloomberg's premises with her name on the door; granting her access to Bloomberg's internal computer system; assigning her a Bloomberg email account; and providing her an orange Bloomberg employee badge, rather than the green badge provided to contractors. Further, whenever Ms. Riggi inquired as to any personnel matter, Ms. Vega directed her to speak with Bloomberg's Human Resources office.

51.    Rose/CRI operated jointly with Bloomberg to direct Ms. Riggi's duties, and paid Ms. Riggi from a CRI checking account.

52.    Starting in or about 2013, Ms. Vega directed Ms. Riggi to perform makeup services for a new show, "The Week," in addition to her work on the Charlie Rose Show. This work required Ms. Riggi to perform additional tasks, outside of her normal schedule for the Charlie Rose Show. She performed these additional tasks each week that she worked, from the inception of "The Week" in 2013, until Defendants terminated her in November 2017. Ms. Riggi did not receive additional compensation for this work.

### B.  The Defendants' Culture of Misogyny

53.    Mr. Rose created a toxic work environment for women working on the Show, sexually harassing, dominating and diminishing them, without fear of reprisal.

54.    Bloomberg, by its supervisors and managers knew of this harassment and abuse but did nothing to prevent or remediate it, instead, enabling it and aiding and abetting it.

55.    Mr. Rose specifically bullied, demeaned and degraded Ms. Riggi because of her sex throughout her tenure on the Show.

56.    Ms. Riggi personally observed Mr. Rose use his position of power to touch, ogle, flirt with, harass, demean and/or degrade other women on the Show.

57.    Ms. Riggi's makeup room and the adjacent Green Room (which were on a different floor than the staff's offices) served as a hub for the Show's female staff and interns, who congregated there to take refuge from Mr. Rose's harassment and abuse.

58.    In addition to Ms. Riggi's personal observations, countless women came to her, in the makeup room, the Green Room and elsewhere, to complain to her about Mr. Rose's harassing and degrading behavior toward  them.

### 1. Mr. Rose's Demeaning, Degrading, Gender-Based Abuse of Ms. Riggi and Bloomberg's Refusal to Address It

59.    Ms. Riggi was responsible for ensuring that Mr. Rose and guests of the Show were "ready for air," and that their makeup was properly applied.  In addition to applying makeup for guests of the Show, she also was responsible for Mr. Rose's on-air appearance, even on occasions when he chose to apply his own makeup.

60.    One of her responsibilities was to provide "Last Looks" on set to ensure that Mr. Rose and guests were ready for air.  This entailed appraising their appearances and making last-minute adjustments to hair, makeup and visual appearance.

61.    Mr. Rose verbally abused Ms. Riggi on an almost daily basis during this process, and regularly swatted at her physically as she attempted to comb his hair or adjust his makeup. Ms. Riggi learned simply to hold out a hairbrush for Mr. Rose to use himself, but Mr. Rose nonetheless would swat at her hand.

62.    On one occasion in or around 2015, while taping on location at a restaurant in Lower Manhattan, Mr. Rose became upset while Ms. Riggi was applying his makeup, and then forcefully grabbed and twisted her arm, physically hurting her, stating, "How does that feel, do you like that?" This abuse caused Plaintiff to cry, which Ms. Riggi observed appeared to cause

Mr. Rose satisfaction.

63.     Ms. Riggi immediately reported what had happened to several supervising producers on the shoot, including Torrey Paquette. The next day, back at the studio, she told several Bloomberg supervisors about the incident, including Ms. Vega, the Production Manager and several Senior Producers. None of these individuals escalated the incident to Human Resources, and Ms. Vega dismissively responded, "That's just Charlie being Charlie."

64.     On information and belief, Bloomberg did not do anything in response to her reports.

65.     Eventually, when doing "Last Looks" or adjusting Mr. Rose's makeup, Ms. Riggi resorted to using a large hand mirror as a shield so that Mr. Rose could not physically assault her.

66.     Soon after this incident, Mr. Rose's treatment of Ms. Riggi worsened, and he became even more hostile toward her on the set. On information and belief, in retaliation for Ms. Riggi's complaint about Mr. Rose's behavior, Mr. Rose started asking young female staff with no background in makeup to perform tasks on set that were Ms. Riggi's responsibility, such as "touching up" Mr. Rose before air. At times, Mr. Rose told Ms. Riggi that he did not need her to do these tasks because he had "younger, attractive women" who could do them instead.

67.     Mr. Rose's decision to ask staff with no makeup experience to perform some of these tasks placed these women in a difficult position, and sabotaged Ms. Riggi's efforts to perform her work properly and maintain her stellar professional reputation, which was tied to how the Show's host and guests looked during taping.

68.     Invariably, when Mr. Rose's makeup or visual appearance needed additional adjustment, Producers would interrupt the taping and instruct Ms. Riggi to go on set to fix the

problem, which upset Mr. Rose and subjected Ms. Riggi to a new round of his abuse.

69.     Mr. Rose also routinely ridiculed Ms. Riggi's physical appearance, making derisive and inappropriate comments about her weight. Mr. Rose often made these comments to Ms. Riggi in front of other staff, publicly shaming and humiliating her before friends and colleagues.

70.     Mr. Rose abused and harassed numerous women over the course of many years. This abuse, coupled with Mr. Rose's direct abuse of Ms. Riggi, created a hostile work environment for Ms. Riggi. Moreover, her experience serving as a resource for other distraught female staff who suffered Mr. Rose's harassment contributed to the hostile work environment and caused her great emotional distress, as did Mr. Rose's hostile reaction to her when he realized she was a resource for other women. As Mr. Rose learned that Ms. Riggi offered a listening ear to the women he had abused and sexually harassed, his hostility toward her grew, and he intensified his abuse and ostracization of her.

### 2. Mr. Rose's Harassment and Abuse of Other Women and its Creation of a Hostile Work Environment[1]

71.     Ms. Riggi observed Mr. Rose abuse and harass numerous women over the course of many years. She also was a resource for distraught female staff who suffered such harassment. Her near daily experience of this conduct created a hostile work environment and caused her great distress. The following are examples of abuse and harassment that Ms. Riggi witnessed, or which impacted her directly due to the victim's reliance on her for

---

[1] In order to respect the privacy of women who have not voluntarily come forward to share publicly their stories of Mr. Rose's abuse and harassment, Ms. Riggi does not name, at this time, all of the women she describes in this Complaint.

support, or use of the makeup room as a safe haven.  These examples are not intended to be a complete statement of Mr. Rose's unlawful conduct, or an exhaustive recitation of all his harassment.

72.     In the late 1990s, Ms. Riggi observed Mr. Rose repeatedly berate and belittle one of the Show's first Personal Assistants. Mr. Rose often berated this Personal Assistant in the studio, demeaning her with unwarranted criticism and personal attacks. The Personal Assistant often took refuge in Ms. Riggi's makeup room after these personal attacks, visibly shaken and in tears. After crying, she would ask Ms. Riggi to repair her makeup so as to avoid exposing herself to further abuse from Mr. Rose.

73.     In or about the mid-2000s, an Executive Assistant regularly came into the Makeup Room upset, complaining that Mr. Rose had demeaned her intelligence and physical appearance. Although the Executive Assistant was an attractive young woman, she claimed that Mr. Rose mistreated her and undercompensated her because he did not consider her his physical type. She also complained that Mr. Rose called her at all hours of the night, criticizing her and berating her.

74.     From approximately 2012 through 2015, a Personal Assistant regularly complained to Ms. Riggi that Mr. Rose treated her abusively and sexually harassed her.  She told Ms. Riggi that Mr. Rose called her late at night, asked her whether she had a boyfriend and inquired about her love life. This Personal Assistant told Ms. Riggi that her then-boyfriend was unhappy with the late-night calls, and that she began shutting her cellphone off at night to avoid Mr. Rose's harassment. She also complained to Ms. Riggi that Mr. Rose regularly required her to accompany him on work trips where she had no substantial work

14

duties.

75.     Ms. Riggi routinely saw Mr. Rose engage in "handsy" behavior with women on the Show.  In the months before the Show was cancelled, Ms. Riggi saw Mr. Rose behaving inappropriately with three young female staffers, in particular: Katherine Brooks Harris, an Associate Producer; Sydney McNeal, an Executive Assistant; and Chelsea Wei, a Broadcast Assistant.

76.     On numerous occasions, Ms. Riggi observed Mr. Rose draping his arms around them, putting his arm around their waist, pulling them close to him during work conversations, keeping his hand on them for the duration of conversations, placing his hand on the small of their back while walking with them, and in general, violating their personal space and subjecting them to invasive physical contact during work.

77.     Ms. Riggi commiserated with Ms. Harris and Ms. McNeal about this inappropriate behavior.  Ms. Riggi observed Mr. Rose engage in similar inappropriate conduct with numerous other female employees over the years, including Kyle Godfrey-Ryan, an Assistant, and a number of other female producers and assistants who have not yet come forward publicly to report the abuse and harassment they experienced.

78.     Mr. Rose spoke deprecatingly of women in the studio, giving them sexist, inappropriate names, which he used in front of staff and guests.  He called Ms. Vega his "Mexican Marilyn Monroe."  He called Ms. Harris, Ms. McNeal and Ms. Wei "his girls," and regularly commented on their beauty and physique.  Mr. Rose boasted to male guests that "I have the most beautiful staff" and "here they are, my Charlie's Angels."  Ms. Harris, Ms. McNeal and Ms. Riggi frequently exchanged "eye rolls" when Mr. Rose made such

comments.

79.     Women who were forced to travel with Mr. Rose complained that he treated them as adornments, demanding their presence on trips even when their presence was not necessary for the work.

80.     Female staff often joined Ms. Riggi in the makeup room or Green Room to commiserate with each other about Mr. Rose's behavior. During one "Green Room" session with a number of female staff, Ms. Riggi heard a Senior Producer make reference to "the crusty claw," a reference to Mr. Rose's propensity to grab female staff inappropriately. When that same Senior Producer was an intern, Ms. Riggi observed Mr. Rose menace and berate her on numerous occasions, forcing her to hide from Mr. Rose in the Green Room.

81.     Another Producer was so rattled by Mr. Rose's treatment of her that, in or around 2015, she had to abandon her office, which was near Mr. Rose's office, and take up a make-shift residence in the makeup room. This Producer told Ms. Riggi that Mr. Rose had done "something awful" to her.  She regularly complained to Ms. Riggi about Mr. Rose's sexist, misogynistic behavior, and came into the makeup room visibly shaken after encounters with Mr. Rose. The Producer told Ms. Riggi that she believed Mr. Rose wanted to get rid of her because she "knew too much."

### 3. Mr. Rose's Treatment of Young Female Interns

82.     Throughout her time on the Show, Ms. Riggi encountered scores of interns associated with Mr. Rose's ventures, the vast majority of whom were young, attractive women.

83.     Mr. Rose regularly demanded that his young, attractive female interns deliver

items to his homes, including a daily preparatory packet that would get delivered to him in advance of the next day's shooting.

84.     As has been reported, Mr. Rose often used these visits to lure young women to his apartment. In turn, the show's female interns often complained to Ms. Riggi about having to make such deliveries.  Over the years, Ms. Riggi often heard that Mr. Rose greeted his interns at his home in a bathrobe or towel.  Sometimes women told her this directly, and other times, she overheard women discussing these experiences near the makeup room.

85.     Sarah Gordon, an intern for the Show in 2002, complained to Ms. Riggi about being required to drop off packages at Mr. Rose's apartment.  She told Ms. Riggi about a particular drop off at Mr. Rose's apartment during which Mr. Rose greeted her in a towel after emerging from the shower, prompting her to flee the apartment.  Ms. Gordon later publicly reported that, during a particular drop-off at Mr. Rose's Sherry Netherland Apartment, Mr. Rose made her watch a sex scene from a movie and asked her whether it aroused her.

86.     In August of 2017, a young woman employed on the show confided in Ms. Riggi that she felt "uncomfortable" going to Mr. Rose's apartment at the Sherry-Netherland Hotel to hand deliver him information.  When Ms. Riggi asked why, she declined to answer, but made a facial expression communicating disgust.  When Ms. Riggi asked if Mr. Rose had been "gross," the woman appeared tense, and shook her head affirmatively, saying "uh huh."  Ms. Riggi suggested that the intern leave the package with the hotel's concierge and/or inform Ms. Vega.  The staffer expressed concern that neither of those options were viable, and that pursuing them could result in her termination.

87.     Ms. Riggi also regularly encountered young female interns who were assigned to work in one of Mr. Rose's homes. These young women rarely appeared at office functions and parties, and Mr. Rose and Ms. Vega rarely mentioned them, shrouding their assignments in secrecy.  One of the interns she met was Reah Bravo, who later reported being sexually harassed by Mr. Rose while working in his home.  Ms. Bravo told Ms. Riggi, at the time, that her internship was not what she had hoped it would be.

### 4. Mr. Rose's Use of Internships and Jobs to Lure Attractive Young Women to his Home, Dinner and Lunch

88.     On information and belief, Mr. Rose used his position, and dangled jobs on the Show, to lure women into having dinner and lunch with him, under the pretense of job interviews or career discussions. On information and belief, Mr. Rose used the Green Room to impress such women, telling them to come to the set of the Show during taping and wait for him there for interviews. Mr. Rose would then tell the women, upon information and belief, that their interviews were to be conducted at his home or over a meal. Ms. Riggi regularly encountered women in the Green Room waiting for Mr. Rose for such "interviews."  Ms. Riggi met Willa Frej waiting for Mr. Rose in the Green Room in or around June 2014.  Ms. Frej subsequently reported on her negative experience of "interviewing" with Mr. Rose for employment.

89.     Ms. Riggi never saw any purported male applicants for positions on the Show waiting for Mr. Rose in the Green Room.  Ms. Riggi, upon seeing these unsuspecting women, would think to herself, "here's another dream dashed," since she could not recall ever seeing any such applicants receive a position with the Show.  In fact, most of the time when she met women waiting in the Green Room for such interviews, there were no known

vacancies on the Show.

90.     In or around 2004, the Defendants hired a Personal Assistant to Mr. Rose who told Ms. Riggi that Mr. Rose had met her at a BMW dealership on 57th Street in Manhattan. She told Ms. Riggi that Mr. Rose promised to make her his personal assistant in the office, and bring her with him as he travelled the world.  This Personal Assistant told Ms. Riggi that Mr. Rose had given her the use of his car, a credit card and had rented her a condominium apartment in Hoboken, New Jersey.  She told Ms. Riggi that in return, as a quid pro quo, Mr. Rose asked her to have sex with him and give him massages.  She said that Mr. Rose had instructed her to avoid the makeup room, and that both Mr. Rose and Ms. Vega had told her not to speak to guests in the Green Room, and to avoid that area entirely.  The Personal Assistant's presence in the makeup room made Ms. Riggi very uncomfortable, especially upon learning from her that Mr. Rose did not want her there, which caused Ms. Riggi to feel that her job might be jeopardized.

91.     In or around 2014, Ms. Riggi observed three young, attractive French women working as interns on the Show. She found their presence curious, because they did not speak English very well, and did not appear to perform the normal duties required of interns. When Ms. Riggi inquired as to their presence in the studio, she was told by producers that they were French models, who had been referred to Mr. Rose by a prominent French celebrity acquaintance.  Subsequently, Ms. Riggi heard Mr. Rose boasting on the set to his male guests about his three French models.

92.     On or about October 10, 2017, shortly before the Show was cancelled, Ms. Riggi and several female colleagues watched Mr. Rose interview journalist Tina Brown

about accusations leveled against another accused serial harasser, Harvey Weinstein.
Describing Mr. Weinstein's conduct, Ms. Brown observed that there is "[s]omething so
humiliating [in] believing that you're going for a business meeting and finding that, actually,
it was a ruse. It's very deeply humiliating there's something deeply shaming about realizing
that you've been snookered, that, you thought you were going to a meeting about a
script…and, actually, what you were going for was so that he could, ... make an advance on
you."[2]  One of the women with Ms. Riggi commented, to general assent, that Mr. Rose was
the wrong person to be conducting this interview.

### 5. Sexual Harassment at Work-Related Parties and Events

93.    Mr. Rose regularly hosted parties for staff, who were expected to attend,
including, *inter alia*, annual summer pool parties at his Bellport home, holiday parties at the
since-closed Spotted Pig restaurant/bar, going-away parties for departing employees at other
trendy restaurants, and sometimes parties at his Sherry-Netherland apartment.  Ms. Riggi felt
pressured to attend these  events.

94.    At his annual holiday party, for example, generally held each December at the
Spotted Pig's private, top-floor party room, Mr. Rose drank heavily, and inappropriately
touched his female staff and other women whom he had invited. Though Ms. Riggi typically
left these events before they concluded, she would be told the following day at work that
Mr. Rose had drunk in excess and stayed out until 3 or 4 a.m., requiring assistance to get to
his car service.  As widely reported, at a 2011 holiday part at the Spotted Pig, Mr. Rose

---

[2] *See* https://charlierose.com/videos/31048

forcibly kissed a female CBS employee, who then reported the incident to a CBS executive producer.

95.    On or about early June 2017, Mr. Rose threw a going away party for a Producer at the since-closed Breslin restaurant, which was located within the Ace Hotel. Ms. Riggi observed Mr. Rose, immediately upon arrival, insert himself between Ms. Harris and Ms. McNeal, who were seated on a bench. He greeted them as "his girls," commented on their physical appearance, and draped his arms over their shoulders. Mr. Rose later gave a speech, drink in hand and appearing intoxicated, during which he put his arm around the Producer's waist, repeatedly pulled her into his body, stared at her chest, appeared determined to look down her shirt, and repeatedly kissed her on the cheek.

96.    Mr. Rose exhibited similar sexually inappropriate behavior at another going away party for a different Producer, on or about late July 2017, at the since-closed Salvation Taco restaurant's rooftop.  Ms. Riggi observed Ms. McNeal dancing at the party, accompanied by friends, and then noticed Mr. Rose ogling her inappropriately. When Ms. McNeal sat down with Ms. Brooks Harris, Mr. Rose again inserted himself between them, spreading his arms across their backs and shoulders.  When Mr. Rose, who had been drinking, gave a speech, he stumbled over his words, and as at the prior party, wrapped an arm around the Producer, repeatedly kissed her on the cheek, and stared at her chest.

97.    Mr. Rose typically held an annual summer pool party for the staff at his home in Bellport.  Mr. Rose often drank heavily at these parties, and female staff were wary of his advances.  At a party Ms. Riggi attended in August 2016, Ms. Riggi noticed that, aside from one other makeup artist in attendance, she was the only woman to swim in Mr. Rose's pool.

When Ms. Riggi asked her female coworkers to join her for a swim, they declined, with one female colleague noting that Mr. Rose was watching them from the second floor of his home.

98.    At another summer pool party in Bellport, Ms. Riggi observed Mr. Rose, in an inebriated state, grabbing at an attractive female producer when she attempted to leave, imploring her to spend the night. When a male colleague intervened to rescue the woman, Mr. Rose became visibly upset.

99.    Ms. Riggi also attended a birthday party for Mr. Rose at his Sherry-Netherland home, at which she observed Mr. Rose holding a female intern on his lap. When Mr. Rose called for a female Executive Assistant, who was in the kitchen with Ms. Riggi, to come join him, the Executive Assistant stated that she did not want to be subjected to such treatment, and she avoided joining Mr. Rose for as long as she perceived possible without drawing his ire.

### C. Summary

100.    Defendants created, fostered, enabled, and aided and abetted a hostile work environment based on sex.

101.    Ms. Riggi reported the unlawful conduct, and numerous supervisory employees witnessed or were victimized by it, but Defendants failed to take any remedial action.

102.    Bloomberg knew or should have known of the unlawful discrimination, but failed to address it, and instead, engaged in, caused, perpetrated, committed, authorized, condoned, ratified, aided and abetted it.

103.    Defendants' conduct has caused Ms. Riggi, and continues to cause her, substantial physical harm and emotional anguish, anxiety, humiliation, loss of reputation, loss of career

opportunity, lasting embarrassment, and other non-monetary losses.

## AS AND FOR A FIRST CAUSE OF ACTION

### Hostile Work Environment in Violation of Title VII

104.    Ms. Riggi repeats and realleges the allegations contained in Paragraphs 1 through 103 of this Complaint as though recited in full herein.

105.    Defendants, by the actions described above, have discriminated against Plaintiff because of sex, creating a hostile work environment and other adverse actions in violation of 42 U.S.C. § 2000e.

106.    Ms. Riggi has suffered, is now suffering and will continue to suffer irreparable injuries, monetary damages and compensatory damages because of Defendants' discriminatory acts unless and until this Court grants the relief requested herein.

107.    Defendants' actions were willful and demonstrated a reckless indifference to the right of Plaintiff to work free of sexual harassment on the job, entitling Ms. Riggi to punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### Hostile Work Environment in Violation of the NYSHRL

108.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 107 of this Complaint as if recited in full herein.

109.    Defendants, by the actions described above, have discriminated against Plaintiff because of gender, creating a hostile work environment and adverse actions in violation of the NYSHRL, N.Y. Exec. L. § 296(1)(a).

110.    Ms. Riggi has suffered, is now suffering and will continue to suffer irreparable injuries, monetary damages and compensatory damages because of Defendants' discriminatory

acts unless and until this Court grants the relief requested herein.

111.   Defendants' actions were willful and demonstrate a reckless indifference to the right of Plaintiff to work free of sexual harassment on the job, entitling Ms. Riggi to punitive damages.

**AS AND FOR A THIRD CAUSE OF ACTION**

**<u>Aider and Abettor Liability Under NYSHRL</u>**

112.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 111 herein as though recited in full herein.

113.   Defendants Bloomberg and CRI have violated the NYSHRL, N.Y. Exec. Law 296(6) by aiding and/or abetting sex discrimination against Plaintiff.  Defendants Bloomberg and CRI knew or should have known of Mr. Rose's unlawful, harassing conduct, but failed to take any action to prevent or mediate it.

114.   Ms. Riggi has suffered, is now suffering and will continue to suffer irreparable injuries, monetary damages and compensatory damages because of Defendants' unlawful conduct unless and until this Court grants the relief requested herein.

115.   Defendants' actions were willful and demonstrate a reckless indifference to the right of Plaintiff to work free of sexual harassment on the job, entitling Ms. Riggi to punitive damages.

**<u>DEMAND FOR A JURY TRIAL</u>**

Plaintiff, by and through her above-signed counsel, hereby demands a trial by jury in the above-captioned action.

24

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment on all Counts, as follows:

**A.** Enter a judgment in favor of Plaintiff against Defendants declaring that the acts and practices complained of herein are in violation of Title VII and the NYSHRL;

**B.** Award Plaintiff as against Defendants, jointly and severally, the amount of wages, including without limitation wages, back pay, front pay, bonuses, benefits, and interest lost as a result of Defendants' unlawful conduct;

**C.** Award Plaintiff as against Defendants, jointly and severally, consequential damages for losses resulting from Defendants' unlawful conduct;

**D.** Award Plaintiff as against Defendants, jointly and severally, compensatory damages for, among other items, injury, impairment and damage to her good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss enjoyment of life, lasting embarrassment and humiliation, and other pecuniary and nonpecuniary losses;

**E.** Award Plaintiff as against Defendants, jointly and severally, punitive damages;

**F.** Award Plaintiff as against Defendants, jointly and severally, pre-judgment interest;

**G.** Award Plaintiff as against Defendants, jointly and severally, the costs of this action, together with reasonable attorneys' fees;

**H.** Award Plaintiff any and all other damages provided by the applicable statutes and applicable law; and

**I.** Award Plaintiff such further legal relief as may be just and proper.

Dated: October 23, 2024
New York, New York

STULBERG & WALSH, LLP
Attorneys for Plaintiff

Patrick J. Walsh
James L. deBoer
14 Wall Street, Suite 5G
New York, New York 10005
(212) 268-1000